UNITED STATES DISTSRICT COURT

DISTRICT OF CONNECTICUT

3.16 mj 307-SALM

| | | |
|---|---|---|
| STATE OF CONNECTICUT | : | 2016 AUG 23  PM 3 39 |
| | : | Uss New Haven, Connecticut |
| COUNTY OF NEW HAVEN | : | August 18, 2016 |

**AFFIDAVIT**

I, Wendy A. Bowersox, being duly sworn, depose and state:

1.       I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code ("U.S.C."), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.   I am a Special Agent with the Federal Bureau of Investigation ("FBI").   I have been so employed by the FBI since July 2010.  Prior to becoming a Special Agent with the FBI, I was employed as a Child Protective Investigator for the Department of Children and Families in Florida, for approximately four (4) years.  Since March 2015, I have been assigned to the Child Exploitation program of the New Haven Division of the FBI where my primary duties have been to identify, investigate and assist in the prosecution of individuals who violate federal laws involving child pornography, including violations pertaining to the production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. § 2252A, as well as individuals who violate federal laws involving child prostitution and sex trafficking.  I have become familiar in the conduct of such investigations through on-the-job experience, and discussions with other Agents and officers who have been conducting child prostitution and sex trafficking investigations for several years.  I have also attended training classes related to child exploitation investigations put on by the FBI, the Department of Justice, and the Connecticut State

1

Police.  I have participated in the execution of several search and seizure warrants involving child exploitation matters.

2.      I submit this affidavit in support of an application for a search warrant for a grey Samsung Galaxy S6 bearing serial number 990005828232406, herein after referred to as the "TARGET DEVICE," recovered by officers of the Bridgeport Police Department on August 16, 2016, during a car stop of Darryl Morris, who was wanted on a federal warrant for violations of Title 18, United States Code Section 1594(c) (Conspiracy to Commit Sex Trafficking of a Minor), Section 1591(a)(1), (b)(2), and (c) (Sex Trafficking of a Minor), and Section 1591(a) and (b)(1) (Sex Trafficking by Force, Fraud, or Coercion).  The TARGET DEVICE is currently maintained in property storage at the FBI office in New Haven, Connecticut.

3.      As is more fully set forth below, there is probable cause to believe that the TARGET DEVICE contains evidence, fruits and/or instrumentalities of violations of Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594, as more fully described in Attachment A.

4.      The information contained in this affidavit is based on, among other information, the following: interviews of witnesses and/or victims; information, police reports, and other documents obtained by the FBI and officers of the Bridgeport Police Department; my personal knowledge and involvement in the investigation, as well as that of other special agents of the FBI; and my training and experience as a criminal investigator, in conjunction with the training and experience of other investigators involved in the case.

5.      Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrants, it does not include all information gathered to date by the FBI and other law enforcement entities in relation to this investigation.  Rather, it contains

2

information that I believe establishes probable cause to believe that evidence, instrumentalities and fruits of the federal criminal violations outlined in Attachment A are located in the TARGET DEVICE.

6.      Based on the facts described below, there is probable cause to believe that evidence, fruits, and instrumentalities, as more specifically defined in Attachment A, of violations of the crimes of Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594, will be found in the TARGET DEVICE.

## SUMMARY OF THE INVESTIGATION

### *Background on Internet, Backpage, and Prostitution Operations*

7.      The website located at http://www.backpage.com, hereinafter "Backpage," is an Internet site consisting of classified advertisements specific to designated geographical areas. When users post an advertisement, they may designate the area in which the ad should be posted. In Connecticut, there are four designated geographical sections on Backpage: Hartford, New Haven, Eastern Connecticut, and Northwest Connecticut.

8.      Within each geographical section on the Backpage website are several different categories of goods and services that users may advertise. Those categories include cars, homes for sale or rent, furniture, and employment, among others. There is also an "adult" section, which includes such categories as "escorts," "body rubs," "strippers & strip clubs," "dom & fetish," "ts," "male escorts," and adult jobs.

9.      In order to post an advertisement on Backpage, a user must follow certain steps, in substance as follows:

a. Navigate, on either a computer or other device capable of accessing the Internet, including a smartphone (a cellular phone with Internet browsing capabilities) to the Backpage website;

b. Choose a geographical area and category of good or service to be offered, for example, Hartford escorts;

c. Write an advertisement, including a title, more specific location, description of service offered, email address, and phone number;

d. Upload, if desired, photographs to be posted with the advertisement;

e. Preview the advertisement;

f. Verify the validity of the email address provided (through use of an email sent by Backpage); and

g. Confirm the advertisement.

10.     The user may also pay for premium services, such as re-posting the ad to the top of the list for the designated category periodically.  Your affiant is aware that ads are listed on Backpage according to the time at which they were posted, and the ads near the top of the list tend to yield the most interest from viewers.

11.     Based upon my training and experience in conducting investigations of prostitution and sex trafficking operations, I know that the adult section of Backpage, and in particular the escort category, contains advertisements for prostitutes.  Although in the "escort" category, these advertisements are often thinly veiled offers of commercial sex.  These Internet posts may advertise either or both of "in-calls," where the customer would meet with a prostitute at a hotel room rented by and/or for the prostitute, or "out-calls," where the prostitute meets a customer at his/her home or other location of the customer's choosing.  I am aware, based on my training and

experience in prostitution investigations, that Backpage ads are often used as a mechanism for pimps, prostitutes, or those working for pimps, to post advertisements for prostitution.

12.     I am also aware, based on my training and experience, that pimps or those working with pimps may take actual photos of the girls or women working as prostitutes, often using smart phones and/or digital cameras, and then post those pictures to prostitution advertisements. In some cases, rather than posting directly from a smartphone, the photos may also be texted or emailed to an address accessible to the pimp, for saving on a computer and use in a subsequent advertisement. Photos from a digital camera typically must be downloaded to a computer, and then may be uploaded to the Internet.

13.     I am also aware, based on my training and experience, that pimps and prostitutes typically use cellular phones, including smartphones, to conduct business related to prostitution. Phones are typically used (i) to provide a phone number on Internet or print prostitution advertisements for a potential customer to call – these phones are typically carried by a prostitute or another individual working for the pimp who may set up appointments for the prostitutes; and (2) to maintain communication between the pimp and the prostitutes or other associates who work for the pimp in his/her operation.  I am aware, based on numerous past investigations and interviews of prostitutes and pimps, that pimps often require their prostitutes to maintain constant contact with their pimps regarding their prostitution activities.  Phones with Internet access may also be used to post prostitution advertisements directly.

14.     I have also learned that it is common for pimps to utilize more experienced women not only to work as prostitutes, but also to actively recruit other women to work for the pimp.  The term "bottom bitch" or simply "bottom" is used by pimps and prostitutes for the female that has been with the pimp for the longest or is the top earner, and often carries out the duties of recruiting

new prostitutes and/or managing those prostitutes' activities. The pimp may also employ women or girls, sometimes other prostitutes themselves, to answer phones and make appointments for prostitutes, and may also employ other men to transport and/or supervise his prostitutes.

### *Summary of Investigation*

15.     In May 2016, I began investigating a prostitution operation conducted by DARRYL Morris, also known as "King Sincere" ("Morris") and Neshaya Dozier, also known as "Zori" or "Sparkle" ("Dozier"). As part of that investigation, and as more fully described below, I have learned that at least one minor female, referred to herein as Minor Victim 1 ("MV-1"), was employed as a prostitute in that operation.

16.     On May 2, 2016, officers of the East Hartford Police Department responded to a welfare check at the Holiday Inn hotel located at 100 East River Drive in East Hartford after they received a complaint from a juvenile's mother that the juvenile, who had run away from her home in New York, was in room 308 of that hotel and was "scared." Upon arrival at the hotel, hotel staff told the officers that they had observed three females in room 308, which had been rented earlier that day by Dozier. The officers proceeded to room 308 and knocked on the door. MV-1 answered the door. The officers pulled her aside and she identified herself as the missing juvenile from New York. The officers observed that she had bruises and scars on various parts of her body, including her face. Dozier and another woman, Ayanna Quinonnes, were also in room 308.

16.     MV-1 was taken the police station, where she disclosed that she had been working as a prostitute for a pimp named "Darryl." MV-1 was too afraid at that time to provide the police with Morris's last name. MV-1 told the police that "Darryl" had inflicted the wounds—which included bruises and holes on her arms, a long scar on one of her arms and on her stomach, and a scar underneath her left eye—on her. MV-1 also disclosed that she had come

6

to East Hartford with two other women to have sex with men for money. She stated that "Darryl" had hit her a lot over the past couple of days in a couple of other towns, including with a television cable wire. The officers photographed the wounds and also photographed a tattoo on MV-1's neck that depicted a bar code and the words "King Sin." She further disclosed that while the other women were with a prostitution customer, she had used one of the women's phones to text her mother because she was afraid; her pimp had previously broken her phone, so she had to use another phone. MV-1 was reunited with her mother later that day.

17.     An East Hartford Police Department detective later visited the Holiday Inn hotel and obtained the registration record for room 308 on May 2, 2016. The room was rented to Neshaya Dozier and was paid for with a credit card. Subsequent investigation identified "Darryl," the pimp MV-1 had partially identified, as Darryl Morris of Bridgeport, Connecticut. Morris and Dozier are believed to be dating and have a child together.

18.     MV-1 was interviewed by the undersigned on several occasions during the course of this investigation. During these interviews, she disclosed the following information:

- She initially started working in prostitution when she was 14 years old. She is currently sixteen years old.

- In approximately November 2014, she was working in prostitution at a hotel in New York when she met Morris at the hotel. Initially, Morris was nice to her. The day that she met Morris, he took money from her and told her to pack her things because she would be "out of pocket." At the time, she did not know what that meant; she later learned that it meant she would not be able to talk to other pimps.

- Morris then took her from the hotel in New York to his home in Bridgeport, Connecticut, where she first met Dozier and another woman who went by the nickname "Milan." After allowing her to rest for a couple of days, MV-1 began to work in prostitution. Dozier, at Morris's direction, would post ads for MV-1's sexual services on a website called Backpage.com, which has an adult services section. Morris would take the pictures of MV-1 for the ad on his phone and then send them to Dozier. The prices were $60 for fifteen minutes, $100 for thirty minutes, and $150 for an hour. MV-1 estimated that she would see approximately 10 clients per day. Dozier and "Milan" were also working as prostitutes for

Morris.  MV-1 would give all of the money that she earned through prostitution to Dozier, who would then give it to Morris.  Morris would keep in contact with Dozier by using his cell phone.  When it was time to leave a hotel, Morris would call Dozier and tell her to get everyone ready

- Approximately two weeks into MV-1's stay with Morris and Dozier, Morris began to beat MV-1 with his fists.  He would punch and kick her when he was upset with her, including when she used her phone to communicate with people that she knew from New York.

- During her time with Morris and Dozier, Morris would transport MV-1 to various locations, including the Bronx, Washington, D.C., Elizabeth, New Jersey, and Boston to perform prostitution in these places.  While in these places, Dozier would post ads on Backpage for MV-1's sexual services.  Morris would also take MV-1 to known "tracks," which are locations frequented by prostitutes to meet potential customers.

- In approximately April 2015, MV-1 decided to leave Morris.  When she attempted to leave, he beat her.  She snuck out later that night while he was sleeping and returned home to her mother.  She was then placed in a residential care program in New York.

- In approximately November 2015, while still living at the residential program, MV-1 reached out to Morris because she missed him.  He encouraged her to return to Bridgeport, which she did.  She began working for him in prostitution again shortly after returning to Bridgeport.

- Between November 2015 and early May 2016, MV-1 worked for Morris and Dozier as a prostitute in various locations, including the Bronx and Boston.  Morris would transport MV-1 to these locations by driving her in a black Mercedes Benz that he had purchased in part with the money that MV-1 had made while working in prostitution.  Morris also made MV-1 travel to Atlanta to work in prostitution; he drove his own vehicle there but had MV-1 and Ayanna Quinonnes take a bus to Atlanta so that he would not risk getting in trouble with the police if they were found together.

- On the day that MV-1 was recovered by police in East Hartford, she was with Dozier and Quinonnes at the Holiday Inn.  In the few days before coming to East Hartford, Morris had been beating MV-1 badly with a television wire and a crate.  Morris had driven MV-1, Dozier, and the other woman from Boston to East Hartford in the black Mercedes Benz vehicle.  After Dozier rented the room at the Holiday Inn, Morris stayed for a couple of hours but then left the hotel.  Dozier posted an ad on Backpage for MV-1 and ads for herself and Quinonnes.  While Dozier and Quinonnes were seeing a client, MV-1 found Dozier's phone in the hotel room bathroom and reached out to her mother for help.

- Morris had forced MV-1 to get the barcode and "King Sin" tattoo on the back of MV-1's neck.  Morris's nickname was "King Sincere."  A friend of Morris's had

drawn the tattoo on MV-1. The bar code was meant to signify that MV-1 was Morris's property. Dozier also has a tattoo with a crown and the word "Sincere" to indicate her loyalty to Morris.

- Morris and Dozier were aware that MV-1 was underage because she told them her true age. Morris provided MV-1 with marijuana nearly every day, in addition to providing her with alcohol and "molly," which is a form of ecstasy.

19.     The investigation revealed that approximately 408 ads were posted on Backpage advertising MV-1's commercial sexual services between October 19, 2014, and May 2, 2016. Many of the ads depict photographs of MV-1. Although many of the ads were free ads that did not require payment, ads posted for MV-1's sexual services on May 1, 2016, and May 2, 2016, were paid for with a debit card held by Dozier. Additionally, on June 30, 2016, United States Magistrate Judge Sarah A.L. Merriam authorized a search warrant for Morris's Instagram account. Within the Instagram account were photographs depicting MV-1, Morris, Dozier, and Quinnones together; posts associating Morris with the "King Sincere" nickname; and posts referencing pimping and prostitution.

20.     On August 9, 2016, a federal grand jury in New Haven, Connecticut, returned an indictment charging Morris and Dozier with violations of Title 18, United States Code Section 1594(c) (Conspiracy to Commit Sex Trafficking of a Minor) and Section 1591(a)(1) and (b)(2) (Sex Trafficking of a Minor), both relating to the prostitution of MV1, and charging Morris with a violation of Title 18, United States Code, Section 1591(a) and (b)(1) (Sex Trafficking by Force, Fraud, or Coercion). Arrest warrants for both Morris and Dozier were issued in connection with the indictment.

21.     At approximately 9:00 p.m. on August 16, 2016, Morris was arrested by the Bridgeport Police Department on the outstanding warrant for sex trafficking. In connection with Morris' arrest, the Bridgeport police officers seized the TARGET DEVICE. They secured it in evidence until it was transferred to the custody of the FBI on August 17, 2016. The TARGET

DEVICE has remained in evidence storage at the FBI since that date. The phone was turned off when it was seized by the Bridgeport Police and are in the same state currently as it was when it was taken into evidence by the Bridgeport Police Department.

## ELECTRONIC DATA

### *Technical Terms*

22.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be

retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

          c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

          d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23.     Based on my training, experience, and research, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and this device can access the Internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### *Electronic Storage and Forensic Analysis*

24.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

25.     *Forensic evidence.*  As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

        a.  .   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

     c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

     d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

27.    *Manner of execution.*    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

28.     With regard to the TARGET DEVICE, I request permission to enter and search the device for evidence relating to Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594, as more fully described in Attachment A.  Specifically, I am seeking evidence of (1) whether the TARGET DEVICE was used to facilitate the posting of advertisements for prostitution of any minor or other individual, (2) whether the TARGET DEVICE contains evidence of communications between MV-1, Neshaya Dozier, Ayanna Quinnones, Darryl Morris, and/or other individuals concerning a prostitution operation; (3) whether the TARGET DEVICE contains evidence of prostitution advertisements, accessing the Internet in furtherance of prostitution activity, and/or stored photographs or other evidence, in whatever form, of prostitution activity.  Your affiant also seeks evidence of the identity of the users and/or owners of the TARGET DEVICE.

29.     It is also requested that this Court grant permission to retrieve the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  It is also requested that the warrant be deemed executed once a TARGET DEVICE has been seized in the manner described above, and that further analysis of the TARGET DEVICE be permitted at any time thereafter.

## CONCLUSION

30.     Based on the foregoing, there is probable cause to believe, and I do believe, that evidence, fruits, and instrumentalities, more specifically defined in Attachment A, of the crimes of Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594 will be found in the TARGET DEVICE.

31.     Wherefore, your affiant respectfully requests that a warrant be issued authorizing a search of the TARGET DEVICE for the items described in Attachment A and authorizing the seizure of all such items, which constitute fruits, evidence, and/or instrumentalities of violations of Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594.

32.     Because part of this application pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrant being requested herein may compromise the investigation and increase the risk of harm to witnesses and victims in that ongoing investigation, whose identities may not be known and whose cooperation is confidential, I request that the warrant, application, and this affidavit be ordered sealed by the Court, until further order of the Court.

Wendy Bowersox
Special Agent
Federal Bureau of Investigation


Sworn to before me this 18th day of August, 2016.

/s/ Sarah A. L. Merriam, USMJ

HON. SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## DESCRIPTION OF ITEMS TO BE SEIZED

Forensic examination is authorized of One (1) grey Samsung Galaxy S6 bearing serial number 990005828232406 ("TARGET DEVICE "), which was recovered during a car stop of Darryl Morris who was wanted on a federal warrant on August 16, 2016, in relation to the investigation of Darryl Morris and Neshaya Dozier, and which is currently maintained in property storage at the FBI office in New Haven, Connecticut.

On the TARGET DEVICE, seizure is authorized of all records, in whatever form, that relate to violations of Sex Trafficking, in violation of 18 U.S.C. § 1591, and Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594, including:

    a. Photographs of the Minor Victim whose appearance and identity are known to law enforcement (who was encountered at the Holiday Inn located at 100 East River Drive, East Hartford, Connecticut, on May 2, 2016), and photographs of Darryl Morris, Neshaya Dozier, Ayanna Quinnoes, "Milan," and/or any other individuals involved in prostitution-related activity;

    b. Evidence of communications, in any form, involving the Minor Victim, Darryl Morris, and Neshaya Dozier, Ayanna Quinnones, "Milan," and any other individuals involved in prostitution related activity;

    c. Evidence of prostitution related communications, in any form, involving any individual;

    d. Evidence of the posting, or the facilitation of posting, of Internet advertisements for the purpose of prostitution;

    e. Evidence of the use of the Internet in furtherance of a prostitution operation;

f.  The telephone number, ESN number, serial number, SIM card numbers, and/or any other identifying information of the TARGET DEVICE;

g.  Any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET DEVICE;

h.  Records of Internet Protocol addresses;

i.  Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

j.  Any information regarding the travel and lodging of the Minor Victim, Darryl Morris, Ayanna Quinnones, and Neshaya Dozier, as well as the travel and lodging of any other individual for purposes of prostitution related activity;

k.  Evidence regarding money transmittals via Western Union, Money Gram, or other money transmittal business;

l.  Evidence regarding the purchase and/or use of pre-paid debit cards; and

m.  All bank records, checks, credit card bills, account information, and other financial records.

n.  Evidence of the fruits or proceeds of a prostitution operation, including but not limited to photos, videos, or communications involving U.S. currency, jewelry, and cars.

Seizure is further authorized of evidence of user attribution showing who used or owned the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

To the extent that the TARGET DEVICE contains removable storage media, examination of such removable media is specifically authorized for the same evidence as described in this attachment.